## JOHN BUCKINGHAM *et al.*

*v.*

## AUGUST FISHER.

1. WAREHOUSEMAN AND WHARFINGER. A person doing a private business as a warehouseman, and keeping a private wharf, and not acting under any license or statutory authority, is under no legal duty to place guards on the wharf to prevent teams from falling into the water, or to provide places for hitching horses at his warehouse, and is not liable for an injury growing out of the want of such provision being made.

2. SAME—*not held to the care required of common carriers.* Common carriers are held to the highest degree of care for the safety of passengers that is consistent with the prosecution of their business, and are made insurers of property intrusted to them, except as against the acts of God or the public enemy. But an ordinary warehouseman is only liable for ordinary care, or such care as prudent men usually exercise over their own property.

3. SAME—*not held to same care, in respect to approaches, as common carriers.* Railway companies are bound to provide, not only safe engines, cars, track and other machinery and servants, but also to provide and maintain safe platforms and approaches to their cars; and carriers by water, safe approaches to their vessels; but a private warehouseman or wharfinger is under no such obligation. He, like a merchant, blacksmith or miller, is only liable for ordinary care in the structure of his buildings and appurtenances.

4. SAME—*may be liable where he makes dangerous approaches.* If private warehousemen, merchants, blacksmiths, millers, or other persons engaged in business, construct approaches to their places of business, knowing the same to be defective, or have trap-doors known to be unsafe, where their customers must necessarily pass, and such defects are concealed, or not apparent, it seems they will be liable for any injury resulting therefrom.

5. Unless a party is under some public duty to repair a way, even though to his place of business, he will not be liable, for failing to do so, for injury thereby caused to others.

6. CONTRIBUTORY NEGLIGENCE. Where the servant of the plaintiff drove plaintiff's team to defendant's warehouse and wharf, and hitched the horses to a clog, but wound his lines around the hub of the wagon, so that, when the horses backed, the lines became shortened, and thus caused them to back into the river near by, where they were drowned, and the wagon and harness lost: *Held,* that, owing to the negligence of the servant, the plaintiff could not recover.

APPEAL from the Circuit Court of Cook county ; the Hon. JOHN G. ROGERS, Judge, presiding.

This was an action on the case, by August Fisher against John Buckingham, Ebenezer Buckingham and the Illinois Central Railroad Company. The opinion of the court contains a substantial statement of the facts of the case. A trial was had in the circuit court, resulting in a verdict finding the two Buckinghams guilty, and assessing the plaintiff's

damages at $850, and finding the railroad company not guilty. The court, overruling a motion for a new trial, rendered judgment upon the verdict, and the Buckinghams appealed.

Mr. JOHN N. JEWETT, for the appellants.

Messrs. STORY & KING, for the appellee.

Mr. JUSTICE WALKER delivered the opinion of the Court:

Appellants, when this suit was brought, held a lease from the Illinois Central Railroad Company, of a warehouse and the ground upon which the house was erected. They were using it for the storage of grain consigned to them and other persons in the city. The railway company discharged the grain it transferred from the country to the city, into this warehouse. It was located on the bank of the Chicago river, on the margin of which there was a dock at which lake vessels landed, and received cargoes of grain from the warehouse, for shipment to the eastern markets. There was an open space between the warehouse and the dock, over which teams passed to receive grain stored in the warehouse, for delivery in the city. Such teams passed over the narrow space left for the purpose, on the west, between the warehouse and the river, or dock line, and turned on a space about forty feet square, at the north end of the building. After turning, the teams were driven near to the door of appellants' office, where the driver, on presenting his order, received from the clerk a ticket for a wagon load of grain, when he again drove on the narrow strip, to the west of the warehouse, and received his load of grain. Teamsters going there for grain, had, therefore, to leave their teams whilst they went into the office to procure tickets, as they were only delivered to teamsters when their wagons were at the warehouse to receive grain. Whether places for hitching teams, whilst drivers were in the office procuring tickets, were provided, seems to be involved in doubt, as the evidence on that point is very conflicting.

Appellee, having purchased some grain in the warehouse, in the latter part of April, or first of May, 1871, sent his team to remove it, and whilst the driver was in the office, according to the rules adopted by appellants, to receive a ticket for a load of grain, his horses, which had been hitched to a clog weighing 22 pounds, commenced backing, and before the driver could reach them, they backed over the edge of the wharf into the river, and were drowned, and the wagon and harness were lost. The evidence shows that there was no fender or guard of any kind on the edge of the wharf, to prevent the wheels of the wagon from running off and into the river. This action was brought to recover for the loss of the team, wagon and harness, upon the hypothesis that it was the duty of appellants to place guards or fenders on the edge of the wharf, as a protection to teams from accident, and for the alleged negligence in not providing proper facilities for hitching teams going there for grain.

There is nothing shown in this case from which it appears that appellants were under any legal duty to place guards on the wharf, or to provide means for hitching horses at their warehouse. There is no such statutory requirement, nor are we aware of any common law rule which imposes such a duty on appellants. They were not acting under any license or statutory authority, but were pursuing a private business as private persons, owing, so far as the evidence shows, no special duty to the public in reference to this wharf. The warehouse was private property, or at least the lease was held by appellants as individual property, and used, as other private warehouses, for the storage of grain.

They were not occupying the relation of common carriers, to whom persons and property are entrusted for transportation. In that class of employments, the law has imposed higher obligations, and demands a greater degree of diligence than in ordinary pursuits. Persons engaged in the usual avocations of life are only held to reasonable care and diligence, whilst carriers are held to the highest degree of care

which the mind is capable of exercising, for the safety of persons entrusted to their care to be carried, that is consistent with the exercise of their business, and a carrier of property is an insurer against all casualties, except the acts of God or the public enemy. But an ordinary warehouseman is only liable for ordinary care—such care as prudent men usually exercise over their own property. Thus it is seen there is a broad difference between the liability of a carrier and a warehouseman, as to the custody of goods.

The same difference seems to exist as to the means of approaching the warehouse, or the vessel, train, or other means of transportation. A railway company is bound to not only provide safe engines, cars, track and other machinery and servants, but they are bound to provide and maintain safe platforms and approaches to the cars on their road. Carriers by water are also required to furnish safe approaches to their vessels. Again, a wharfinger is not distinguishable, on principle, from a warehouseman, and has not been distinguished in adjudged cases; whilst the case of a carrier has always been treated as an excepted case, turning on principles peculiar to public policy. Story on Bailments, § 452. If, then, appellants be treated as warehousemen, or as wharfingers, their obligation was only that of ordinary care for property entrusted to them.

We have been referred to no case in which a warehouseman has been held liable for failing to provide safe approaches to his warehouse, nor is it believed that any can be found. It would not be consistent with the analogies of the law, to hold that a person, who is only held to ordinary care in conducting his business, should be held to an extraordinary degree of care in protecting persons coming to his place to transact business with him. He, like a merchant, blacksmith, miller, or other person engaged in business, is only liable for ordinary care in the structure of their buildings and their appurtenances. If such persons should construct approaches they knew to be defective, or were to have trap-doors known to

126       BUCKINGHAM *et al. v.* FISHER.      [Sept. T.

Opinion of the Court.

be unsafe, and such defects were not apparent, but concealed, where their customers would necessarily pass, and injury were to result therefrom, they would probably be liable, but otherwise, if reasonable care was employed in their construction.

The cases referred to in appellee's brief relate to common carriers, to officers whose duty it was to keep public passways in repair, or where the law had imposed it as a duty to the public. The case most nearly analogous to this, is *Radway v. Briggs,* 37 N. Y. R. 256 ; but in that case the assignee of the wharf had covenanted with the city to keep the wharves in good condition and in safe and proper repair, including, especially, the string pieces and other superficial portions thereof, for safe usage, etc. In that case, it appears the wharf was a public one, which the city regarded as requiring them to maintain and keep in repair by taking a covenant from their assignee to repair and to maintain string pieces. This, then, distinguishes that case from this, as there is nothing to show that appellants were required to place string pieces on the edge of the wharf, or that they ever recognized any such duty. That case is fully sustained by authority, so far as it relates to the bringing an action by the person injured.

In the case of *The Mayor of Lyme Regis* v. *Henley,* 27 Eng. Com. Law R. 366, it was held, that, where the King made a grant for the public benefit, and imposed public duties, and the grant was accepted, the duties might be enforced by indictment, or by suit in the name of individuals peculiarly injured.

In the New York case, the grant was made by the city, and it imposed the duty on the assignee of maintaining suitable string-pieces on the wharf, and he not only accepted the grant, but covenanted for the performance of the duty thus imposed. Hence, on the authority of *The Mayor of Lyme Regis* v. *Henley, supra,* the person injured by the non-performance of the duty, had his action against the assignee. That case was much discussed, and the judgment of the court below was affirmed in the Court of Common Pleas, the King's Bench

and in the House of Lords, and may be regarded as entitled to weight as authority on the question.

No rule is more firmly established than that a person, who is not under some public duty to repair a way, is not liable for failing to do so, in case injury results to others. And in this case no such duty appears. Appellant permitted persons to come upon the wharf, but received nothing therefor. Had it been a source of emolument, there would be more plausibility in the claim, but we are not called upon to determine that question, as it is not now before us for decision.

Again, appellee's teamster was well acquainted with the place, and must be presumed to have known its dangers. He had been there frequently before the accident, and if of ordinary intelligence, he could not but have understood its hazards. And where one voluntarily puts himself or his property in a place of known danger, he is held to assume all the risks incident to the position. Such was the case with the servant of appellee in this case. He should have used precautions equal to the danger he incurred, but in this we think he failed. A careful examination of the evidence in the case strongly impresses us with the belief that the teamster did not use the necessary care in securing the team when he went into the office. It is true, he swears that he hitched them to a clog of about 22 pounds weight. This might, and no doubt would, have been all that was required under ordinary circumstances, had he done nothing to produce the misfortune; but we infer that he must have wound his lines around the hub of the fore wheel of his wagon, and if so, and the horses backed, the lines, by winding up on the hub, would become shortened, and pull the horses back, and the further they backed, the tighter the lines would draw, until they either would break, or the horses would back over the wharf into the river. This is believed to be a careless and dangerous habit of many teamsters, and would inevitably produce the result that occurred in this case. We can imagine no other cause for the accident, as there was nothing shown to have

occurred in front of the horses to have frightened them to go backwards, and had noise or other cause occurred behind them, their effort would have been to have gone forward, or if at either side, they would have turned from it, and not backed.

In any view we have been able to consider the case, we can see no grounds of recovery, and the judgment must be reversed.

*Judgment reversed.*